IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION


FILED
NOV 3 0 2015
Clerk, U.S District Court
District Of Montana
Missoula

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH DAVID ROBERTSON, <br><br> Defendant. | CR 15–07–H–DWM <br><br> OPINION and ORDER |

Defendant Joseph David Robertson ("Robertson") was charged by indictment with violations of the Clean Water Act, 33 U.S.C. § 1319(c)(2)(A), and for willfully injuring property of the United States, 18 U.S.C. § 1361. The government alleges that Robertson conducted excavation and pond construction activities between 2013 and 2014 on and around mining claims in Jefferson County, Montana that caused a discharge of pollutants into waters of the United States (Counts I, III)[1] and caused damage to National Forest System Lands (Count II). (*See* Indict., Doc. 3.)

---

[1] Count I involves conduct on National Forest System Lands and Count III involves conduct on an unpatented mining claim, the Manhattan Lode. (*See* Indict., Ex. A, Doc. 3.)

1

On October 5, 2015, Robertson proceeded to trial on all three counts. On the second day of trial, he filed a motion to dismiss for lack of jurisdiction, (Doc. 62), and moved for a judgment of acquittal under Rule 29, (Tr. Trans. 389-90).[2] At the conclusion of the government's case, those motions were denied. (*Id.* at 415, 473.) Robertson renewed his motions at the close of his case, and they were again denied. (*Id.* at 565.) On October 8, 2015, the jury indicated that it could not reach a unanimous verdict on any of the three counts, (*id.* at 628, 632-36), and a mistrial was declared, (Decl. of Mistrial, Doc. 78; Tr. Trans. 642). Robertson now seeks acquittal post-trial under Rule 29(c) of the Federal Rules of Criminal Procedure as to all three counts. (Docs. 92 (Counts I, III) & 94 (Count II).) Robertson's motions are denied.

## SUMMARY CONCLUSION

Sufficient evidence was presented at trial from which a rational trier of fact could have found the essential elements of the offenses alleged in all three counts of the Indictment beyond a reasonable doubt. As to Counts I and III, the jury was instructed on Justice Kennedy's "significant nexus" test outlined in his concurrence in *Rapanos v. United States*, 575 U.S. 715 (2006), and sufficient

---

[2] The Trial Transcript is found at Docs. 86-89. To avoid confusion, citations to the transcript will be to the page number denoted by the Court Reporter, not the page number connected to the docket entry (e.g., Tr. Trans. 222).

evidence was presented from which a rational juror could find, beyond a reasonable doubt, that the waters at issue here met that standard. Sufficient evidence was also presented to show the property at issue in Count II belonged to the United States.

## STANDARD

Pursuant to Rule 29(c)(2), "[i]f the jury has failed to return a verdict, the court may enter a judgment of acquittal." A Rule 29 motion may not be granted if "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Courts "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010).

## ANALYSIS

Robertson contends the evidence presented at trial was insufficient to support a conviction on all three counts of the Indictment. In regards to Counts I and III, Robertson argues the government failed to articulate a lawful standard for what qualifies as "waters of the United States" and that the evidence presented was not sufficient to establish that the waters in question are "waters of the United

3

States." In regards to Count II, Robertson argues that the evidence presented at trial was insufficient to establish that the property implicated was "property of the United States." Those arguments are addressed in turn.

## I. Counts I and III: Clean Water Act

The jury was instructed that in order to find Robertson guilty on Counts I or III, the government must prove beyond a reasonable doubt that: (1) the defendant knowingly discharged a pollutant; (2) the pollutant was discharged from a point source; (3) the discharge was into "waters of the United States," which are those tributaries and/or adjacent wetlands that have a significant nexus to traditional navigable waters; and (4) the discharge was done without a permit. (Instr. No. 15, Doc. 71 at 15.) Robertson's motion for acquittal focuses on the third element, whether the discharge was into "waters of the United States."

### A. The "Significant Nexus" Test

Robertson first argues that the inability of the Supreme Court or the administrative agencies to clarify an understandable definition of "waters of the United States" warrants relief under Rule 29(c). Robertson is incorrect. While Robertson's criticism of the confusion surrounding the definition of "waters of the United States" may have a ring of truth, *see United States v. Moses*, 496 F.3d 984, 988 (9th Cir. 2007) (noting that the "facially simple provisions" of the Clean

Water Act "are not hyaline"), the jury here was instructed on an intelligible standard, the "significant nexus" test outlined by Justice Kennedy in his concurrence in *Rapanos*.

In *Rapanos*, the Supreme Court considered the Clean Water Act in the context of Michigan wetlands positioned near ditches or man-made drains. There a plurality of the Court held that "waters of the United State" "includes only those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes." *Rapanos*, 547 U.S. at 739 (internal quotation marks and alterations omitted). And, for wetlands, the plurality held a "continuous surface connection" is required. *Id.* at 742. In his concurrence, Justice Kennedy articulated a different standard for wetlands based on a "significant nexus" between the bodies of water at issue and traditional navigable waters. *Id.* at 759-87 (Kennedy, J., concurring).

When a majority of the Supreme Court agrees only on the outcome of a case and not on the grounds for that outcome, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotations omitted). Of those circuit courts that have considered *Rapanos*, many

have concluded that Justice Kennedy's opinion constitutes the narrowest holding,[3] including the Ninth Circuit. *N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 999-1000 (9th Cir. 2007). Accordingly, Justice Kennedy's concurring "significant nexus test" controls in this case. *See Moses*, 496 F.3d at 990 (applying Justice Kennedy's opinion as the controlling rule of law in a criminal Clean Water Act action).[4] *Rapanos* has been the law in this area for almost a decade, and the Ninth Circuit has applied the standard outlined in Justice Kennedy's concurrence in criminal cases on more than one occasion. *See id.*; *United States v. Vierstra*, 492 Fed. Appx. 738, 740 (9th Cir. 2012) (unpublished).

Under his test, Justice Kennedy interpreted "waters of the United States" to encompass wetlands that "possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Rapanos*, 547 U.S. at 759 (Kennedy, J., concurring). A "significant nexus" exists "if the wetlands, either

---

[3] *See e.g. United States v. Bailey*, 571 F.3d 791, 798 (8th Cir. 2009); *United States v. Robison*, 505 F.3d 1208, 1221-22 (11th Cir. 2007); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006) (per curiam).

[4] In a civil case following *Rapanos*, the Ninth Circuit stated that its previous caselaw did not "foreclose the argument that Clean Water Act jurisdiction may also be established under the plurality's standard." *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2010). And, at least one district has applied both standards in the criminal context. *See United States v. Vierstra*, 803 F. Supp. 2d 1166, 1170-71 (D. Idaho 2011) (holding that the body of water met the statutory and regulatory definitions of "waters of the United States" consistent with "the *Rapanos* decision" after separately applying both tests). However, in affirming that decision, the Ninth Circuit cited only Justice Kennedy's significant nexus test and *City of Healdsburg*. *United States v. Vierstra*, 492 Fed. Appx. 738, 740 (9th Cir. 2012) (unpublished).

alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. "When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term 'navigable waters.'" *Id.* For tributaries, Justice Kennedy stated that while the existence of an ordinary high water mark "may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute 'navigable waters' under the Act," the breadth of the standard does not adequately account for the significant nexus considerations for adjacent wetlands. *Id.* at 781-82. Justice Kennedy calls for a case-by-case significant nexus analysis of wetlands adjacent to non-navigable tributaries. *Id.* at 782. The Ninth Circuit has since determined that intermittent, seasonal streams can be waters of the United States under this test. *Moses*, 496 F.3d at 990-91.

The jury in this case was instructed that "'waters of the United States' includes traditional navigable waters and tributaries and/or adjacent wetlands that have a significant nexus to traditional navigable waters." (Final Jury Instr. No. 23, Doc. 71 at 23.) The jury was further instructed that "[a] tributary or adjacent wetland has a significant nexus to traditional navigable waters if it (either alone or

in combination with similarly situated water bodies in the region) significantly affects the chemical, physical, or biological integrity of traditional navigable waters." (*Id.*) Instruction Number 23 also defined "traditional navigable waters," "tributaries," "wetlands," and "adjacent." (*Id.*) Accordingly, the jury was provided with a coherent standard to apply in determining whether the waters in question were "waters of the United States."

### B. Sufficiency of Evidence

Robertson further argues that even if "waters of the United States" can be defined, the proof presented at trial was insufficient to establish that the waters in question here meet that definition. Robertson insists that the testimony presented by Todd Tillinger, Montana State Program Manager for the United States Army Corps of Engineers and one of the government's primary witnesses, was flawed because it relied on jurisdictional guidance and the existence of an ordinary high water mark, which he argues did not reflect the significant nexus test. Robertson also criticizes Tillinger's purported failure to perform a flow test. Despite these alleged shortcomings, the evidence presented at trial was sufficient that a rational trier of fact, viewing it in the light most favorable to the government, could have found beyond a reasonable doubt that the waters here have a significant nexus to a traditionally navigable waterway.

As a starting point, sufficient evidence was presented from which a rational juror could find that the tributary and its adjacent wetlands have a hydrological connection with traditionally navigable waters. While a mere hydrological connection is likely insufficient to establish the existence of a significant nexus, *Rapanos*, 547 U.S. at 785 (Kennedy, J., concurring), such a connection is relevant because completely isolated ponds and waters have been found to be largely beyond the Clean Water Act's scope, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 171-72, 174 (2001). Here, the parties agreed that the Jefferson River is a traditionally navigable water and a water of the United States. (Instr. No. 23, Doc. 71 at 23.) During his testimony, Tillinger outlined the Cataract Creek watershed, including the drainage in question, (Tr. Trans. 297-98), and explained the hydrological connection between Cataract Creek and the Missouri River, via the Boulder and Jefferson Rivers, (*id.* at 303-04). In describing the existence and characteristics of the unnamed tributary at issue, Tillinger showed an aerial of the length of the stream. (*Id.* at 305.) Tillinger also discussed a site visit that occurred in October 2014, when he walked the entire length of the tributary from the ponds to Cataract Creek, noting that the tributary had flow the entire length of the way (approximately 2,500 feet). (*Id.* at 320.) Richard Clark, an environmental scientist for the Environmental Protection

Agency, also testified to walking the entire length of the tributary's drainage below the ponds and saw water flowing in the channel. (*Id.* at 420-21.) Both Agent Fisher and Agent Siler stated that every time they have visited the site they saw water flowing in the still-existing portions of the tributary near the ponds. (*Id.* at 102 (Fisher), 420 (Siler).) Additionally, Scott Gillilan, an aquatic restoration expert, testified that he performed a visual flow test on the tributary near the ponds, which he referred to as the "garden hose" test. (*Id.* at 433.) Gillilan estimated the tributary had a flow of 8-16 gallons based on what it looked like compared to a garden hose. (*Id.*) Viewed as a whole, this evidence was sufficient for a jury to find the existence of a hydrological connection.

The next question then is whether there was sufficient evidence presented to show that the hydrological connection was chemically, physically, or biologically significant. *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). There was. The government specifically asked Tillinger about the general chemical, physical, and biological effects tributaries and adjacent wetlands can have in a water system. (*See* Tr. Trans. 325-28.) When asked whether he believed "the tributary and adjacent wetlands flowing through the National Forest Service lands and [the Manhattan Lode] have a significant nexus to the traditional navigable water Jefferson River," Tillinger responded, "[i]t does." (*Id.* at 328.)

Other witnesses also testified to the chemical, physical, and biological connection at issue here. Darin Watschke, a fisheries biologist for the United States Forest Service, and Ron Spoon, a fisheries biologist with the Montana Fish, Wildlife and Parks, both testified that the turbidity and temperatures of the water in the tributary and adjacent wetlands at issue could affect downstream waters, impacting fish populations in Cataract Creek and the Jefferson River. (*Id.* at 265-67 (Watschke), 210-14, 218-20 (Spoon).) Clark also testified to the specific filtering and temperature stabilizing function wetlands play in a water system and how downstream waters are impacted when wetlands are disturbed or destroyed. (*Id.* at 380, 387, 427.) He estimated that approximately 1.5 acres of wetlands were disturbed here. (*Id.* at 387.) Gillilan also emphasized the importance headwater streams and wetlands have on overall watershed, describing the wetland at issue here as a "high quality wetland." (*Id.* at 432-34.) While some of the evidence more generally discussed impacts a headwaters tributary and its adjacent wetlands can have on a traditionally navigable downstream waterway—as opposed to *this* tributary and its adjacent wetlands—evidence was presented that the impact of this tributary and its adjacent wetlands is tied to the cumulative impact of other similarly situated headwaters tributaries in the area. (Tr. Trans. 219 (Spoon); 434 (Gillilan).) Construing the evidence in the light most favorable to the government,

11

sufficient evidence was presented from which a rational juror could find that the significant nexus test was met for both the tributary and its adjacent wetlands.

Additionally, while Robertson is correct that evidence was also presented that spoke to the plurality standard in *Rapanos*—i.e., a relatively permanent flow and a continuous surface connection—the introduction of such evidence does not diminish the sufficiency of the evidence presented relating to the significant nexus test. A jury could look to the evidence presented on the important functions tributaries and wetlands play in a water system in conjunction with the evidence presented about the nature of this tributary and its adjacent wetlands and conclude that they have a significant nexus to a traditionally navigable waterway. Robertson's motion for acquittal as to Counts I and III is denied.

## II. Count II: Willful Injury to Property of the United States

Robertson insists the evidence presented at trial was insufficient to establish that the property involved was "property of the United States," an essential element of 18 U.S.C. § 1361. Robertson also challenges the government's reference to "cadastral" in its closing, arguing that the term was not previously explained to the jury. Contrary to Robertson's argument, the government's first witness, United States Forest Service Special Agent Jackie Fisher, identified the boundaries of the National Forest System Lands known as the "Mohawk Lode" on

Exhibit 42 for the jury. (Tr. Trans. 93-94.) The term "cadastral" was used during the proof stage of trial no less than four times, (*id.* at 105, 137, 435), and was defined during the testimony of Gillilan with reference to Exhibit 27(b):

> Those different shaded blocks in there represent different land ownerships from the cadastral, which is a State of Montana mapping product that is available online. You can see that on the upper northern end of the reconnaissance area is a boundary – near a boundary between private property and Forest Service property. That light green in the middle there is representative – that's U.S. Forest Service property. And then at the bottom of the reconnaissance area is again on private property. This is per cadastral.

(*Id.* at 437.) The evidence presented was sufficient for a rational juror to conclude that the property at issue in Count II of the Indictment belonged to the United States. Robertson's motion for acquittal as to Count II is denied.

## CONCLUSION

Sufficient evidence was presented at trial from which a rational trier of fact could have found the essential elements of the offenses alleged beyond a reasonable doubt. Accordingly, IT IS ORDERED that Robertson's motions for acquittal (Docs. 92, 94) are DENIED.

Dated this 30th day of November, 2015.

Donald W. Molloy, District Judge
United States District Court

13